JENNIFER BECKAGE (*pro hac vice forthcoming*)
jbeckage@thebeckagefirm.com
JULIANA CIPOLLA (*pro hac vice forthcoming*)
jcipolla@thebeckagefirm.com
LEE MERREOT (*pro hac vice forthcoming*)
lmerreot@thebeckagefirm.com
THE BECKAGE FIRM PLLC
403 Main Street, Suite 727
Buffalo, New York 14203
Telephone:    223-253-4762

JENNIFER M. OLIVER (SBN 311196)
jennifer.oliver@bipc.com
BUCHANAN INGERSOLL & ROONEY LLP
One America Plaza
600 West Broadway, Suite 1100
San Diego, Ca 92101
Telephone:    619 239 8700
Fax:          619 702 3898

Attorneys for Plaintiffs
MICHAEL MURPHY and
LAURIE MURPHY

## UNITED STATES DISTRICT COURT

## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL MURPHY and LAURIE MURPHY, | Case No.: |
| Plaintiffs, | **COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| LINKEDIN CORPORATION, | |
| Defendant. | |

Now comes Plaintiffs Michael Murphy ("Mr. Murphy") and Laurie Murphy ("Mrs. Murphy") (collectively, "Plaintiffs"), by and through counsel, and for their Complaint state as follows:

## INTRODUCTION

1.     This matter concerns a sophisticated fraudulent investment scheme perpetrated by a web of unknown individuals (the "Jane Does") using a global social media and network service inappropriately designed, managed, and operated by defendant LinkedIn Corporation ("LinkedIn"), which invited and permitted the Jane Does to operate their fraudulent investment scheme without interference from LinkedIn or warnings from LinkedIn (the "Scheme").

2.      Utilizing LinkedIn's design and reputation of its platform, private messaging, technology, operations, algorithmic connections, email, and other platforms of communication (the "Services"), the Jane Does were able to prey upon registered users of LinkedIn's Services ("LinkedIn Users" or "Users"), including Mr. Murphy, with the goal of stealing Users' investments and retirement savings by leveraging the design flaws and functions of the LinkedIn platform.

3.      LinkedIn's Services allowed the Jane Does to present themselves as credible business contacts using the design and features of the LinkedIn platform and to search for, identify, and target Plaintiffs using personal information LinkedIn required and/or strongly pressured Mr. Murphy to provide. LinkedIn manipulated and deceived Plaintiffs to defraud them into forfeiting approximately $7,300,000.00 of their investments and retirement savings.

4.      Plaintiffs herein assert claims against LinkedIn for ordinary negligence (Count I), gross negligence (Count II), violation of the California Consumer Legal Remedies Act (Count III), breach of contract (Count IV),  violation of the California Business and Professions Law for false advertising (Count V), and common products liability tort (Count VI).

**PARTIES**

***Plaintiffs***

5.      Plaintiff Michael Murphy, the spouse of Plaintiff Laurie Murphy, is an individual residing in St. Louis, Missouri and a citizen of the State of Missouri.

6.      Plaintiff Laurie Murphy, the spouse of Plaintiff Michael Murphy, is an individual residing in St. Louis, Missouri and a citizen of the State of Missouri.

***Defendant LinkedIn Corporation***

7.      Defendant LinkedIn Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1000 West Maude Avenue, Sunnyvale, California 94085.

8.      LinkedIn conducts business throughout the United States and internationally.

**JURISDICTION AND VENUE**

9.      The matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

10.     The matter in controversy is between citizens of different states.

11.     This Court has jurisdiction over the claims in this case pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367(a).

12.     Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of California.

13.     Venue in this Court is appropriate pursuant to the terms of an agreement between the parties.

14.     Alternatively, venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b)(3) as defendant LinkedIn maintains its principal place of business within the Northern District of California and is subject to the Court's personal jurisdiction.

## DIVISIONAL ASSIGNMENT

15.     Pursuant to Civil Local Rule 3-2(e), this action arises in Santa Clara County and assignment to the San Jose Division is appropriate.

## FACTS

### *LinkedIn Pressures Users to Disclose Personal Information*

16.     LinkedIn describes itself as follows:

> We are a social network and online platform for professionals.  People use our Services to find and be found for business opportunities, to connect with others and find information. Our registered users ("Members") share their professional identities, engage with their network, exchange knowledge and professional insights, post and view relevant content, learn and develop skills, and find business and career opportunities. [1]

17.     LinkedIn is well-known as a professional platform for businesspersons, which is why Plaintiffs relied on LinkedIn to be a safe platform to communicate with other like-minded professionals. LinkedIn states: "Who should be joining LinkedIn? LinkedIn is a platform for anyone who is looking to advance their career. This can include people from various professional backgrounds, such as small business owners, students, and job seekers. LinkedIn members can use

---

[1] *See* LinkedIn, "Privacy Policy," August 11, 2020, https://www.linkedin.com/legal/privacy-policy (emphasis added).

COMPLAINT

LinkedIn to tap into a network of professionals, companies, and groups within and beyond their industry.[2]

18.     For LinkedIn's business model to succeed, Users must share personally identifiable information that LinkedIn can then make available to other Users of its Services. This information includes professional and personal information (including demographic information such as birthdate and education) allowing Users to target other Users for connections.

19.     LinkedIn uses personal information as consideration for Users to access the Services.

20.     LinkedIn provides its Users with a public profile, a scrolling feed of other Users' postings, a private messaging interface whereby Users can send private messages to one another, and it presents several levels of membership, including both free and paid memberships.

21.     LinkedIn enables Users to "connect" with other Users via the LinkedIn Services to form their own professional "networks." In LinkedIn's own words, "Our Services allow you to stay in touch and up to date with ***colleagues, partners, clients, and other professional contacts***.  To do so, you can 'connect' with the professionals who you choose, and who also wish to 'connect' with you."[3]

22.     To obtain and possess a LinkedIn account, the User must provide personal data including:

        a.     Name;

        b.     Email address and/or mobile number; and

        c.     A password.

23.     If a User registers for a paid membership, a credit card for payment and billing information is also required and maintained by LinkedIn.

24.     LinkedIn strongly encourages Users to provide optional information, including a User's:

        a.     Education;

        b.     Work experience;

---

[2] https://www.linkedin.com/help/linkedin/answer/a548441/what-is-linkedin-and-how-can-i-use-it-?lang=en as available on May 7, 2025.
[3] *Id.* at Section 2.1 Services, Stay Connected (emphasis added).

c.      Skills;

d.      Photograph;

e.      City or area; and

f.      Endorsements.

25.      LinkedIn also collects additional information upon installing its application, such has having the microphone enabled. LinkedIn also pressures Users to share optional, personal, and sensitive personal information with messaging such as:

a.      "You don't have to provide additional information on your profile; however, profile information helps you to get more from our Services, including helping recruiters and business opportunities find you. It's your choice whether to include sensitive information on your profile and to make that sensitive information public";[4] and

b.      "You don't have to post or upload personal data; though if you don't, it may limit your ability to grow and engage with your network over our Services."[5]

26.      LinkedIn maintains and displays this detailed personal information on User profiles.

***LinkedIn's Privacy Policy***

27.      LinkedIn maintains a privacy policy on its website (the "Privacy Policy"). A copy of the LinkedIn Privacy Policy, which was effective at the time of the facts, circumstances, and alleged conduct contained in this Complaint, is attached as **Exhibit A**.

28.      Based on Plaintiffs' residency in the United States, LinkedIn's Privacy Policy applies to Plaintiffs.

29.      The Introduction to LinkedIn's Privacy Policy states:

a.      LinkedIn's mission is to connect the world's professionals to allow them to be more productive and successful;

b.      Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared; and

c.      This Privacy Policy applies when you use our Services.

---

[4] *Id.* at Section 1.1, Profile.
[5] *Id.* at Section 1.1, Posting and Uploading.

5
COMPLAINT

30.    With respect to the private message portion of the Services, the Privacy Policy states: "We collect information about you when you send, receive, or engage with messages in connection with our Services.  For example, if you get a LinkedIn connection request, we track whether you have acted on it and will send you reminders.  ***We also use automatic scanning technology on messages to support and protect our site***.  For example, we use this technology to suggest possible responses to messages and to manage or ***block content that violates our User Agreement or Professional Community Policies*** from our Services."[6]

31.    With respect to "connecting" one User to another User, the Privacy Policy states:

a.    "We use data about you (such as your profile, profiles you have viewed or data provided through address book uploads or partner integrations) to ***help others find your profile***, ***suggest connections for you*** and others (e.g., Members who share your contacts or job experiences) and enable you to invite others to become a Member and connect with you;"[7] and

b.    You can also opt-in to allow us to use your precise location or proximity to others for certain tasks (e.g., to suggest other nearby Members for you to connect with, calculate the commute to a new job, or notify your connections that you are at a professional event).

32.    LinkedIn's Privacy Policy conspicuously and affirmatively states that its Services allow for connections with Users for legitimate purposes, thereby representing and warrantying other Users are "***colleagues, partners, clients, and other professional contacts***."[8]

33.    LinkedIn leverages Users' data "(including your communications) for security purposes or to ***prevent or investigate possible fraud*** or other violations of our User Agreement and/or ***attempts to harm our Members***, Visitors or others."[9]

34.    LinkedIn also shares its Users' data with third-party service providers, exacerbating the risk of fraud against LinkedIn Users:

---

[6] *Id.* at Section 1.6 Messages (emphasis added).
[7] *Id.* at Section 2.1 Services (emphasis added).
[8] *Id.* at Section 2.1 Services, Stay Connected (emphasis added).
[9] *Id.* at Section 2.9 Security and Investigations (emphasis added).

a.   "We use others to help us provide our Services (e.g., maintenance, analysis, audit, payments, fraud detection, marketing and development);" and

b.   "They will have access to your information as reasonably necessary to perform these tasks on our behalf and are obligated not to disclose or use it for other purposes."[10]

35.   LinkedIn states in its Privacy Policy that it implements security safeguards for Users' data: "We regularly monitor our systems for possible vulnerabilities and attacks."[11]

36.   Through its Privacy Policy, LinkedIn represents that its Services constitute a safe environment for Users to disclose personal information. Plaintiffs detrimentally relied on these representations by LinkedIn.

### *LinkedIn's User Agreement*

37.   LinkedIn maintains a user agreement on its website.  A copy of the User Agreement effective February 1, 2022, is attached as **Exhibit B**.

38.   LinkedIn's User Agreement specifically states that its Services are "designed to ***promote economic opportunity*** for our members by enabling you and millions of other professionals to meet, exchange ideas, learn, and find opportunities or employees, work, and ***make decisions in a network of trusted relationships***."[12]

39.   Joining LinkedIn creates a binding contract between its Users and LinkedIn, as stated in the User Agreement:

a.   "You agree that by clicking 'Join Now,' 'Join LinkedIn,' 'Sign Up,' or similar, registering, accessing or using our services (described below), you are agreeing to enter into a legally binding contract with LinkedIn (even if you are using our Services on behalf of a company);" and

---

[10] *Id.* at Section 3.5 Service Providers.
[11] *Id.* at Section 5.1 Security.
[12] *See* LinkedIn, "User Agreement," Preamble, Feb. 1, 2022, https://www.linkedin.com/legal/user-agreement (emphasis added).

COMPLAINT

b. "If you do not agree to this contract ('Contract' or 'User Agreement'), do not click 'Join Now' (or similar) and do not access or otherwise use any of our Services."[13]

40. The User Agreement incorporates by reference and hyperlink LinkedIn's Privacy Policy, stating, "…the collection, use and sharing of your personal data is subject to this Privacy Policy (which includes our Cookie Policy and other documents referenced in this Privacy Policy) and updates."[14]

41. LinkedIn sets limitations on its Users, including:

a. "LinkedIn reserves the right to limit your use of the Services, including the number of your connections and your ability to contact other Members;"[15] and

b. "LinkedIn reserves the right to restrict, suspend, or terminate your account if you breach this Contract or the law or are misusing the Services (e.g., violating any of the Dos and Don'ts or Professional Community Policies)."[16]

42. LinkedIn manipulates Users' data for automated processing, routinely providing Users with connection recommendations:

a. "We use the information and data that you provide and that we have about Members to make **_recommendations for connections_**, content and features that may be useful to you;"[17] and

b. "For example, we use data and information about you to recommend jobs to you and you to recruiters.  Keeping your profile accurate and up to date helps us to make these recommendations more accurate and relevant."[18]

43. LinkedIn provides the following "Dos and Don'ts" in its User Agreement: [19]

**_LinkedIn's published Dos and Don'ts_**

a. You agree that you will:

---

[13] *Id.* at Section 1.1 Contract.
[14] *Id.*
[15] *Id.* at Section 3.4 Limits.
[16] *Id.*
[17] *Id.* at Section 3.6 Automated Processing (emphasis added).
[18] *Id.*
[19] *Id.* at Section 8.1 Dos and 8.2 Don'ts (all emphasis added).

8

(1)  Comply with ***all applicable laws***, including, without limitation, privacy laws, intellectual property laws, anti-spam laws, export control laws, tax laws, and regulatory requirements;

(2)  ***Provide accurate information*** to us and keep it updated;

(3)  Use your ***real name on your profile***; and

(4)  Use the Services in a ***professional manner***.

b.  You agree that you will not:

(1)  ***Create a false identity*** on LinkedIn, ***misrepresent your identity***, create a Member profile for anyone other than yourself (a real person), or use or attempt to use another's account;

(2)  Develop, support or use software, devices, scripts, robots or any other means or processes (including crawlers, browser plugins and add-ons or any other technology) to scrape the Services or otherwise copy profiles and other data from the Services;

(3)  Override any security feature or bypass or circumvent any access controls or use limits of the Service (such as caps on keyword searches or profile views);

(4)  Copy, use, disclose or distribute any information obtained from the Services, whether directly or through third parties (such as search engines), without the consent of LinkedIn;

(5)  Disclose information that you do not have the consent to disclose (such as confidential information of others (including your employer);

(6)  Violate the intellectual property rights of others, including copyrights, patents, trademarks, trade secrets or other proprietary rights.  For example, do not copy or distribute (except through the available sharing functionality) the posts or other content of others without their permission, which they may give by posting under a Creative Commons license;

(7)  Violate the intellectual property or other rights of LinkedIn, including, without limitation, (i) copying or distributing our learning videos or other materials or (ii) copying or distributing our technology, unless it is released under open source licenses; (iii) using the word "LinkedIn" or our logos in any business name, email, or URL except as provided in the Brand Guidelines;[20]

(8)  Post anything that contains software viruses, worms, or any other harmful code;

(9)  Reverse engineer, decompile, disassemble, decipher or otherwise attempt to derive the source code for the Services or any related technology that is not open source;

---

[20] The published "Dos and Don'ts" contain an internal link to "Branding Guidelines" that are not included here.

(10) ***Imply or state that you are affiliated with or endorsed by LinkedIn without our express consent*** (e.g., representing yourself as an accredited LinkedIn trainer);

(11) Rent, lease, loan, trade, sell/re-sell or otherwise monetize the Services or related data or access to the same, without LinkedIn's consent;

(12) Deep-link to our Services for any purpose other than to promote your profile or a Group on our Services, without LinkedIn's consent;

(13) Use bots or other automated methods to access the Services, add or download contacts, send or redirect messages;

(14) Monitor the Services' availability, performance or functionality for any competitive purpose;

(15) Engage in "framing," "mirroring," or otherwise simulating the appearance or function of the Services;

(16) Overlay or otherwise modify the Services or their appearance (such as by inserting elements into the Services or removing, covering, or obscuring an advertisement included on the Services);

(17) Interfere with the operation of, or place an unreasonable load on, the Services (e.g., spam, denial of service attack, viruses, gaming algorithms); and/or

(18) Violate the ***Professional Community Policies***[21] or any additional terms concerning a specific Service that are provided when you sign up for or start using such Service, and the Bing Maps terms[22] where applicable.

(Emphasis added.)

44.    LinkedIn writes algorithms to implement its requirements and standards set forth above, which includes identifying and preferring content that appears trustworthy to the algorithm, or it will suppress content if deceptive or harmful. It may also add labels to help connect Users together. This, along with other features and tools, provides LinkedIn incredible control over the connections between its Users and the content that will appear, allowing for predatory users to gain access to the Services.

---

[21] The published "Dos and Don'ts" contain an internal link to "Professional Community Policies" that are not included here.

[22] The published "Dos and Don'ts" contain an internal link to "Bing Maps terms" that are not included here.

COMPLAINT

*__The Investment Scheme__*

45.    The Scheme involved the Jane Does having the ability to create fake profiles and then using the LinkedIn Services to identify, target, and communicate with potential victims, gradually luring them with false information into making purported "investments" that were only a ruse for the Jane Does to commit theft.

46.    Plaintiffs were solicited by the Jane Does and persons acting on behalf of or in concert with the Jane Does initially through LinkedIn's Services, to manipulate and deceive Plaintiffs into investing money in what Plaintiffs believed were legitimate investments.

47.    Plaintiffs' "investments" were sent both via wire to legitimate U.S. banks into accounts belonging to illegitimate entities and fraudsters, and via crypto currency transfers from legitimate crypto currency exchanges to illegitimate investment platforms.

48.    The "investments" were sent to the U.S. banks in United States Dollars, were transferred by the account holders and exchanged for cryptocurrency (or alternately "crypto"), then laundered through various crypto trading platforms resulting in substantial losses and harm to Plaintiffs.

49.    After "investing," Plaintiffs' cryptocurrency and assets were traded and transferred countless times on several crypto trading platforms.

50.    Defendant is LinkedIn, and the individual Jane Does are purported to be "Hannah," "Lee Yue" and "Benedict V," all of whom were part of this Scheme.

51.    After several months of relationship building by the Jane Does that began through LinkedIn's Services, Plaintiffs relied on the professional character of the Jane Does via LinkedIn because it is a professional network, the statements made by LinkedIn regarding its Services, and the statements of the Jane Does and LinkedIn and their actions, and in some instances omissions, which led Plaintiffs to send funds to the Jane Does' recommended platforms.

52.    Defendant LinkedIn possessed prior knowledge of the Scheme, and similar schemes occurring that would defraud Users.

53.    Defendant LinkedIn should have known about the fraudulent actors, the Jane Does, based upon representations in Defendant LinkedIn's sophisticated Privacy Policy and User Agreement.

54.    LinkedIn's Services were the vehicle used by the Jane Does, and Plaintiffs relied on LinkedIn to be a safe platform in which to build professional relationships with other Users.

55.    Defendant LinkedIn knew or should have known that the Jane Doe LinkedIn accounts were not tied to legitimate persons or entities and that they engaged in illegal or unlawful behavior.

56.    This matter is not a situation of a "bad investment" by Plaintiffs – this is gross negligence and material breaches of various duties by LinkedIn, which knowingly or negligently permitted through improperly designed technology in its Services to allow for a global crypto fraud campaign and breeding ground of threat actors against its Users, including Plaintiffs and, in this case, the Jane Does to coerce and trick Plaintiffs into wiring millions of dollars, a large portion of their retirement funds.

57.    LinkedIn failed to warn Plaintiffs that the Jane Does targeted and lured victims through LinkedIn and allowed the Jane Does to create User profiles.

58.    To facilitate the Scheme, the Jane Does knew that to build trust with their targeted victims on LinkedIn and facilitate the fraud, an appearance of a legitimate enterprise was required.

59.    The Scheme included the use of LinkedIn platform capabilities and features to appear as legitimate business connections and target victims, which included leveraging information about age, education, employment, and other demographics.

60.    The Scheme involved inexperienced technology practices and development of the Services, including LinkedIn's platform, which attracts fraudsters and provides them countless tools to target victims in a sophisticated manner.

61.    The Scheme violated Plaintiffs' right to privacy as they did not consent to their personal information being shared with threat actors.

62.    The Scheme violated LinkedIn's policies.

63.    The Scheme involved vulnerabilities in LinkedIn's Services, including platform development that encouraged and fostered cryptocurrency criminals.

64.    The Jane Does encouraged investment trading by Plaintiff Michael Murphy on platforms that were fake.

65.    The funds Plaintiffs contributed to the investment trading platforms were routed directly to accounts controlled by the Jane Does.

66.    Eventually, Plaintiffs were locked out of their accounts and lost all assets.

### *Jane Doe 1 ("Hannah" or "Hannah/Lee")*

67.    On or about October 2022, an individual representing herself as Hannah Lin (hereinafter "Hannah") initiated LinkedIn private message communications with Plaintiff Michael Murphy. Hannah leveraged the features of LinkedIn to appear as a legitimate and professional contact.

68.    Pursuant to LinkedIn's User Agreement, LinkedIn maintains all communications between Users and is in exclusive control and possession of such information.

69.    These communications are not available to Plaintiffs, and it is believed that at some point LinkedIn knew of the scam and removed the profile.

70.    Hannah explained that she was interested in connecting with businesspeople in the United States and leveraged her "professional" profile and position on the LinkedIn platform to create credibility.

71.    After a period of time building rapport by communicating about business experiences, Hannah sent Plaintiff Michael Murphy a message that some communications of her trading results were sent in error.

72.    These "error" communications were sent to Plaintiff Michael Murphy as a ploy to introduce her real intent, to trick Plaintiff Michael Murphy into being interested in her fake trading activities.

73.    She further offered, through LinkedIn private messaging, to teach Plaintiff Michael Murphy how to trade like she was and to shadow-trade alongside of her with the same trades-her trades-if he was interested.

74.    Once Plaintiff Michael Murphy agreed to what Hannah was offering, she provided him with specific instructions on how and where to connect with the broker and trading platform she was using.

75. On or about November 28, 2022, Hannah's profile was removed from LinkedIn.

76. Upon information and belief, LinkedIn removed Hannah's profile.

77. On that same day, Plaintiff Michael Murphy received a "WhatsApp" communication from an unknown telephone number, 1(XXX) XXX-1688 (area code and prefix redacted by counsel), stating: "This is Hannah from LinkedIn."

78. On November 29, 2022, at 8:48 a.m., Hannah initiated further communication with Plaintiff Michael Murphy.

79. At 10:26 a.m., Plaintiff Michael Murphy responded to Hannah and a WhatsApp conversation occurred; part of that conversation included Hannah revealing to Plaintiff Michael Murphy that her real name is "Lee Yue" (hereinafter "Hannah/Lee").

80. A series of WhatsApp messages between Plaintiff Michael Murphy and Hannah/Lee occurred from November 28, 2022, through June 29, 2023.

81. On January 26, 2023, Plaintiff Michael Murphy successfully transferred $60,000.00 to a cryptocurrency exchange.

82. On January 31, 2023, Hannah/Lee successfully convinced Plaintiff Michael Murphy to sign up for MoodyFX and walked him through the process of transferring the $60,000.00 from to a different crypto address.

83. In April and May 2023, Hannah/Lee criticized Plaintiff Michael Murphy for not adding more money. Plaintiff started to get suspicious at that time and spoke to law enforcement in May 2023. In the months that followed, Plaintiffs began investigating where their payments went and what parties may be responsible for the loss of their retirement funds.

*__Jane Doe 2 ("Benedict V")__*

84. On or about October 2022, an individual, representing herself as Benedict V (hereinafter "Benedict V"), initiated LinkedIn private message communications with Plaintiff Michael Murphy. Benedict V leveraged the features of LinkedIn to appear as a legitimate and professional contact.

85. Pursuant to LinkedIn's User Agreement, LinkedIn maintains all communications between users and is in exclusive control and possession of such information.

86.    These communications are not available to Plaintiffs as it is believed at some point that LinkedIn knew of the scam and removed the profile.

87.    Benedict V explained that she was interested in connecting with businesspeople in the United States, leveraging her "professional" status and connections on the business platform LinkedIn.

88.    After a period of time building rapport by communicating about business experiences, Benedict V sent Plaintiff Michael Murphy a message stating that some communications of her trading results were sent in error.

89.    She further offered through LinkedIn private messaging to teach Plaintiff Michael Murphy how to trade like she was and to shadow her trades if he was interested. The platform allows any User on the platform to private message Plaintiff Michael Murphy.

90.    Once Plaintiff Michael Murphy agreed to what Benedict V was offering, she provided him with specific instructions on how and where to connect with the broker and trading platform she was using.

91.    On or about November 28, 2022, Benedict V's profile was removed from LinkedIn.

92.    Upon information and belief, LinkedIn removed Benedict V's profile.

93.    However, on February 9, 2023, Plaintiff Michael Murphy received a "WhatsApp" communication from an unknown telephone number, 1(XXX) XXX-4563 (area code and prefix redacted by counsel), stating:  "Dear Michael, this is Benedict V."

94.    Benedict V continued and stated "my mobile phone is broken and the screen cannot be used, so I changed my mobile phone number to send you a message..."

95.    During February and March 2023, there were numerous messages between Benedict V and Plaintiff Michael Murphy.

96.    In March 2023, Plaintiff Michael Murphy added more funds to his account, which was funded at approximately $4,000,000.00.

97.    Mid-month March 2023, Plaintiff Michael Murphy attempted to withdraw funds and was denied.

98.    On March 16, 2023, Plaintiff Michael Murphy attempted to withdraw his funds, but his account was restricted, and he was unable to withdraw his funds at that time.

### *Total Amount of Transactions*

99.    Between January and March 2023, Plaintiffs' total transfers and wires amounted to approximately $7,300,000.00, which directly stemmed from LinkedIn's breach of contract and negligence that caused Plaintiff Michael Murphy to rely on the misrepresentations made by LinkedIn.

100.    LinkedIn's failure to abide by the terms of the Contract allowed the Jane Does to use the Services to misrepresent, deceive, and defraud Plaintiffs.

101.    Plaintiffs would not have interacted with Jane Does but for the Services and reliance upon LinkedIn's reputation, branding, representations, and technology. LinkedIn's technology and tools supporting its Services create a false sense of security to Users including Plaintiffs.

102.    Had Plaintiffs known about LinkedIn Services failures and environment it created to bread cryptofraud, Plaintiffs would not have been Users on LinkedIn and used the Services.

103.    LinkedIn omitted in its representations, marketing, and advertising to the Plaintiffs that it had latent defects in its design and technology that would attract and promote fraudsters.

104.    If Plaintiffs had knowledge of this information, it would not have used LinkedIn's Services.

### ***CNBC Story Outlining the FBI's Concerns of Fraud on LinkedIn***

105.    On June 17, 2022 – four months before any of the Jane Does first contacted Plaintiff Michael Murphy – CNBC published an article, entitled "FBI says fraud on LinkedIn a 'significant threat' to platform and consumers" (hereinafter the "CNBC Article").[23]

106.    The CNBC Article sets forth the following key points:

      a.    "The FBI says investment fraudsters pose a "significant threat" to LinkedIn;"

      b.    "Users around the country tell CNBC they lost small fortunes after connecting with someone on LinkedIn who they believed was giving them sound financial advice;" and

---

[23] "FBI says fraud on LinkedIn a 'significant threat' to platform and consumers," CNBC.com, June 17, 2022 (https://www.cnbc.com/2022/06/17/fbi-says-fraud-on-linkedin-a-significant-threat-to-platform-and-consumers.html).

COMPLAINT

1           c.      "The company [LinkedIn] acknowledges a recent increase in fraud and says it

2                  removed 32 million fake accounts last year."

3       107.   Additionally, the CNBC Article outlines the exact scenario set forth in this Complaint,

4  in that:

5           a.      Fraudsters/scammers lure legitimate LinkedIn Users into believing they are

6                  professionals and to be trusted because the fraudsters/scammers are contacting

7                  them on a trusted platform, LinkedIn;

8           b.      LinkedIn's messaging features allow the fraudsters/scammers to utilize

9                  rapport-building techniques to gain victims' trust under the purview of

10                legitimacy provided by the LinkedIn platform;

11          c.      Investors believe the communications and professionals are legitimate;

12          d.      The fraudsters/scammers first direct the Users to a legitimate investor platform,

13                and then to an illegitimate one controlled by the fraudsters/scammers; and

14          e.      All investment funds are then drained from the victims' accounts, and the

15                victims realize the fraud.

16       108.   The CNBC Article further sets forth that the FBI has seen an increase in this kind of

17  investment fraud.

18       109.   LinkedIn Senior Director of Trust, Oscar Rodriquez, was quoted in the CNBC Article,

19  stating:

20           a.      "[T]rying to identify what is fake and what is not fake is incredibly difficult;"

21                and

22           b.      "One of the things that I would really love for us to do more is get into proactive

23                education for members," and "Letting members know or basically allowing

24                them to understand the risks that they might face."

25       110.   According to the CNBC Article, LinkedIn released a statement in response to the

26  article, stating it acknowledged an uptick of fraud on its platform:

27           a.      "'[W]e enforce our policies, which are very clear:   fraudulent activity,

28                including financial scams, are not allowed on LinkedIn.  We work every day

to keep our members safe, and this includes investing in automated and manual defenses to detect and address fake accounts, false information, and suspected fraud;'" and

b. "'We work with peer companies and government agencies from across the world with the goal of keeping LinkedIn members safe from bad actors. If a member encounters or is the victim of a scam we ask that they report it to us and to local law enforcement.'"

***Defendant LinkedIn Knew of the Fraud Scheme, Did Nothing to Stop It, and Actually Promoted It Though Algorithmic Connections***

111.    According to LinkedIn's statements in the CNBC Article, at the time of Plaintiffs' interactions with Hannah/Lee and Benedict V, LinkedIn knew that its Services were vulnerable to fraudsters/scammers like the Jane Does and that its Users relied on LinkedIn as a safe, professional platform.

112.    LinkedIn knew of the specific and significant problem of crypto fraud with its Services yet did not warn or take steps to protect its Users, including Plaintiffs, and continued to make misleading statements and omissions.

113.    Also, according to its statements in the CNBC Article, LinkedIn further knew at the time of Plaintiffs' interactions with Hannah/Lee and Benedict V that LinkedIn's purported defenses allowed fraudster/scammers' profiles to breach LinkedIn's security.

114.    LinkedIn claimed that "from July to December 2021, its automated defenses stopped 96% of all fake accounts."

115.    At the time of Plaintiffs' interactions with Hannah/Lee and Benedict V, LinkedIn was aware of the inadequacy of its efforts to combat fraudster/scammer activity on its platform.

116.    Despite its knowledge of significant risk to its Users, LinkedIn's algorithmic connections continued from the time of the CNBC Article through the time the Jane Does scammed Plaintiffs using LinkedIn's Services.

117.    From the time of the CNBC Article through the time the Jane Does scammed Plaintiffs using LinkedIn's Services, LinkedIn did not remediate the security issues and stop the fraudster/scammers from operating on its platform.

118.    LinkedIn did not adequately inform Plaintiffs of the security issues related to the fraudster/scammers.

119.    LinkedIn knew about the activities of fraudsters/scammers but failed to warn Plaintiffs.

***Defendant LinkedIn's Platform's Features Directly Facilitated the Fraud***

120.    LinkedIn's platform's features and design materially encouraged harmful conduct as described in the Complaint.

121.    LinkedIn's platform features materially amplified and enhanced harmful conduct.

122.    LinkedIn knew of the dangers created by its operations but failed to act and warn.

123.    LinkedIn's unsolicited messaging system and inadequate profile credibility tools enabled the Jane Does to target Plaintiffs and create a false impression of legitimacy, both of which were integral to the fraudulent schemes.

124.    LinkedIn actively facilitated harmful communications whereby the platform's design promotes conduct between fraudsters, including the Jane Does and their victims, including Plaintiff Michael Murphy, by removing barriers that would otherwise prevent these interactions.

125.    During the relevant time period, LinkedIn permitted unsolicited messages from accounts without prior connections, enabling the targeting of Plaintiff Michael Murphy by the Jane Does.

126.    During the relevant time period, Plaintiffs were contacted by the Jane Does through LinkedIn using a fake identity.

127.    LinkedIn permitted the Jane Does to exploit and unlawfully capitalize on LinkedIn's features, such as company affiliations, connections, profiles, and endorsements, to appear legitimate.

128.    Plaintiff Michael Murphy trusted the Jane Doe profiles due to their ties to reputable companies and connections, which LinkedIn did not effectively verify.

129.    These profiles exploited LinkedIn's credibility tools to deceive Users, including Plaintiff Michael Murphy, into trusting and engaging with the Jane Doe fraudsters.

130.    During the relevant period, LinkedIn's automated detection systems were inadequate.

131.    The advancements outlined in a LinkedIn August 2023 blog post[24] exemplify the inadequacy of its automated detection systems at the time of the crypto fraud upon Plaintiffs by the Jane Does.

132.    LinkedIn's 2023 blog post describes the limitations of its legacy framework, which relied on a static prioritization rule and lacked the dynamic, AI-driven capabilities that are in use today.  These deficiencies allowed unlawful conduct to occur and harm Plaintiffs, even allowing that harm to persist longer due to a lengthier review process, thereby further increasing the likelihood that Plaintiff Michael Murphy would be exposed to violative content.

133.    During the relevant time period, dynamic prioritization and continuous updates to content scores as new signals emerge were not present on LinkedIn's platform, leaving harmful content queued under outdated, static rules and delaying intervention.

134.    During the relevant time period, LinkedIn's platform system lacked the capability to dynamically reassess reported content or prioritize based on severity, leaving LinkedIn ill-equipped to handle the fraud scheme perpetrated against Plaintiffs.

135.    LinkedIn's review process allowed the fraudulent profiles and messages used to persist longer than necessary, exposing Plaintiff Michael Murphy to preventable harm.

136.    LinkedIn did not detect synthetic profile photos, exposing Plaintiffs to preventable harm.

137.    LinkedIn acknowledged the significant threat occurring on its platform and therefore was aware of the risk to Plaintiffs but failed to act, for which it had a heightened responsibility to do, particularly in light of LinkedIn's consistent branding as a trusted professional platform, which Plaintiff Michael Murphy relied upon.

138.    LinkedIn was in the best position to detect patterns of fraudulent conduct through its own data sets to prevent the fraud upon Plaintiffs, which was foreseeable by LinkedIn.

---

[24] https://www.linkedin.com/blog/engineering/security/enhancing-security-and-developer-productivity--linkedin-s-journe (as available on May 8, 2025).

139.    LinkedIn did not give a warning to LinkedIn Users by posting a notice on its website or by informing Users by email, including Plaintiffs, what it knew about the activities of fraudsters/scammers.

140.    LinkedIn should have, among other things, warned Users about messages encouraging Users to move conversations off of the platform (a feature it has today).

141.    LinkedIn's actions were unfair and deceptive whereby it falsely alleged its Services were safe and for professionals, when in fact it was a known breeding ground for crypto fraudsters for which its algorithms and design fostered.

142.    LinkedIn marketed and branded itself as a reputable professional community, but it failed to act by not providing mandatory harmful content detection, stricter profile verification, and proactive scam detection.

143.    LinkedIn wrote algorithms to implement its requirements and standards, which included identifying and preferring content that appeared trustworthy to the algorithm or suppressing content if deceptive or harmful. It may also add labels to help connect Users together. These, as well as other features, prioritize User engagement over User safety, allowing LinkedIn incredible control over the connections between Users and the content that appears in User feeds.

144.    LinkedIn's algorithmic systems amplified the reach and credibility of fraudulent profiles, including the Jane Does, by prioritizing engagement metrics, connections, and endorsements, without verifying the authenticity of the profiles and even boosted the visibility of the fraudulent accounts. This created greater risk than benefit in Plaintiff Michael Murphy's use of the Services.

145.    LinkedIn's algorithms materially contributed to the harm caused, transforming User-generated content into something harmful.

146.    Features such as "People You May Know" and search rankings rely on engagement-driven algorithms to recommend profiles and prioritize activity metrics like mutual connections, profile views, and endorsements, which the Jane Does used to appear more credible to Plaintiff Michael Murphy.

147.    Without appropriate checks and review, the Jane Doe accounts were treated the same as legitimate profiles by LinkedIn's algorithms and with the absence of verification, enabled the Jane

Does to game LinkedIn's algorithms gaining undue prominence and reach through fabricated engagement metrics.

148.    LinkedIn is liable to Plaintiffs as a product designer of LinkedIn and the Services.

149.    The facts of the Scheme are in the exclusive possession and control of LinkedIn.

## FIRST CAUSE OF ACTION
(ORDINARY NEGLIGENCE)

150.    Plaintiffs incorporate their previous allegations as if fully rewritten herein.

151.    During all relevant times related to this Complaint, Plaintiff Michael Murphy was a registered User of LinkedIn and used LinkedIn's Services.

152.    Defendant LinkedIn is a service provider in that it provided its Services to Plaintiff Michael Murphy.

153.    In the provision of its Services to Plaintiff Michael Murphy, Defendant LinkedIn had a duty to exercise a degree of care toward Plaintiff Michael Murphy that a reasonable person under similar circumstances would employ to protect Plaintiff Michael Murphy from harm, which included using design, features, and technologies that would not result in its Users being taken advantage of or encourage fraudsters to harm LinkedIn Users.

154.    As of at least June 17, 2022, LinkedIn was aware that criminal activities were occurring on its platforms involving the provision of fraudulent financial investment advice.

155.    LinkedIn had actual knowledge that Hannah/Lee's and Benedict V's profiles were contacting LinkedIn members to participate in fraudulent activities.

156.    Upon information and belief, on or about November 28, 2022, LinkedIn removed Hannah/Lee's and Benedict V's profiles from its Services due to their fraudulent activities.

157.    In the alternative, upon information and belief, on or about November 28, 2022, Hannah/Lee and Benedict V cancelled their memberships with LinkedIn due to inquiries or other investigations by LinkedIn into their fraudulent activities.

158.    Upon information and belief as of November 28, 2022, LinkedIn was aware that Hannah/Lee and Benedict V were using the Services to commit fraud, including leveraging the inadequate design and features of the LinkedIn platform.

159.    LinkedIn owed Plaintiffs a duty to monitor its Services for fraudulent activity.

160.    LinkedIn owed a duty to Plaintiffs to take reasonable measures to design its platform and protect Plaintiffs from fraudulent activities by other Users of LinkedIn's Services.

161.    LinkedIn owed a duty to Plaintiffs to protect Plaintiffs' personal information.

162.    LinkedIn owed a duty to Plaintiffs to restrict the accounts of fraudulent actors and notify any persons with whom said actors had communicated via the LinkedIn platform.

163.    LinkedIn owed a duty to Plaintiffs to warn of online predators generally, and of the scheme employed by Hannah/Lee and Benedict V.

164.    LinkedIn is the sole possessor and interpreter of activities involving its Services, including complaints and feedback it receives related to fraudulent activities.

165.    A reasonable service provider that knew the information contained in the CNBC Article, as LinkedIn did, would have directly notified Plaintiffs about the types of fraudulent financial investment activities occurring through the Services in sufficient detail to allow Plaintiffs to identify the Scheme and take measures to avoid it.

166.    With the actual knowledge LinkedIn had, particularly of the scheme employed by predators including Hannah/Lee and Benedict V, LinkedIn had a duty to make adequate disclosures and warn LinkedIn Users of the danger presented, as well as inform LinkedIn Users of the need to screen and verify the legitimacy of persons using LinkedIn to contact Users for financial investment activities.

167.    A reasonable service provider would have taken affirmative steps to ensure Plaintiffs had received and understood the warning notification described in the immediately preceding paragraphs.

168.    A reasonable service provider would have notified Plaintiffs on or about November 28, 2022, that Hannah/Lee and Benedict V were actual or potential fraudsters.

169.    As evidenced by the CNBC Article, LinkedIn had full and actual knowledge of the specific sham investment scheme described in this Complaint yet did not provide notice to Plaintiffs at any time and concealed and omitted from Users like Plaintiffs the seriousness of the matter and urgency to stop engaging with unauthorized and illegitimate actors.

170.    A warning or notification to Plaintiffs in November 2022 regarding the dangers of corresponding with Hannah/Lee or Benedict V could have prevented Plaintiffs' entire loss because Plaintiffs first wired funds pursuant to the Jane Doe instructions in late January 2023.

171.    LinkedIn had the means and the ability to warn LinkedIn Users and protect Users from a known harm.

172.    LinkedIn owed Plaintiffs a duty of protection from reasonably foreseeable harm, and Plaintiffs relied on LinkedIn as a safe platform in which professionals could connect with one another.

173.    LinkedIn intentionally did not provide Plaintiffs with any such warning.

174.    LinkedIn was in the best position to notify Plaintiffs about the Scheme.

175.    LinkedIn breached its duties to Plaintiffs by failing to address the threat posed by known fraud actors using the Services.

176.    LinkedIn breached its duties to Plaintiffs by failing to warn or otherwise notify Plaintiffs about the known activities described in the CNBC Article.

177.    LinkedIn breached its duties to Plaintiffs by failing to warn or otherwise notify Plaintiffs about the known or suspected activities of Hannah/Lee and Benedict V.

178.    LinkedIn breached its duties to Plaintiffs by failing to have a competent, experienced workforce that knew how to develop a safe platform that would protect its Users from financial fraudsters.

179.    LinkedIn breached its duties by knowingly allowing approximately 1.28 million "fake accounts" to remain and exist on LinkedIn, thereby creating an unsafe environment.

180.    If not for LinkedIn's failure to act, Plaintiffs would not have engaged in financial transfers at the direction of the Jane Does.  In other words, if LinkedIn had performed its duties as a reasonable service provider, Plaintiffs would not have "invested" with the Jane Does.

181.    As a result of Defendant LinkedIn's breach of its duty of care to Plaintiffs, Plaintiffs have been damaged in an amount not less than $7,300,000.00.

## SECOND CAUSE OF ACTION
(GROSS NEGLIGENCE)

182.    Plaintiffs incorporate their previous allegations as if fully rewritten herein.

183.    LinkedIn owed Plaintiffs the duties set forth above.

184.    LinkedIn breached its duties by knowingly allowing approximately 1.28 million "fake accounts" to remain and exist on LinkedIn constituting an extreme departure from the ordinary standard of conduct.

185.    LinkedIn's breaches of duty as set forth above constitute an extreme departure from the ordinary standard of conduct of a reasonable service provider under similar circumstances.

186.    As a result of Defendant LinkedIn's breach of its duty of care to Plaintiffs, Plaintiffs were groomed for fraud and coerced into forfeiting approximately $7,300,000.00 to the Jane Does.

### THIRD CAUSE OF ACTION
(California Consumer Legal Remedies Act)

187.    Plaintiffs incorporate their previous allegations as if fully rewritten herein.

188.    LinkedIn's Services are "services" as defined in California Civil Code § 1761(b).

189.    Plaintiff Michael Murphy is a "consumer" as defined in California Civil Code § 1761(d).

190.    LinkedIn's provision of Services to Plaintiff Michael Murphy and Plaintiff Michael Murphy's use of LinkedIn's Services constitutes a "transaction" as defined in California Civil code § 1761(e) that is intended to result in the sale of services to a consumer as prescribed in California Civil Code § 1770(a).

191.    Plaintiff Michael Murphy is a "senior citizen" as defined in California Civil Code § 1761(f).

192.    LinkedIn knew or should have known that Plaintiff Michael Murphy was a senior citizen because of the personal information LinkedIn required him to provide in connection with the Services.

193.    LinkedIn's misconduct, as alleged herein, caused a substantial loss of property set aside for Plaintiffs' retirement, or for Plaintiffs' personal or family care and maintenance, or assets essential to Plaintiffs' health or welfare.

194.    Users like Plaintiffs are substantially more vulnerable than other members of the public to LinkedIn's conduct because of their demographics, including their age or poor health or infirmity, impaired understanding, restricted mobility, or disability.

195.    Plaintiffs actually suffered substantial physical, emotional, or economic damage resulting from LinkedIn's conduct, in that they lost approximately $7.3 million of their retirement savings as a result of LinkedIn's conduct.

196.    Pursuant to California Civil Code § 1780(e), Plaintiffs are entitled to $5,000 in damages in addition to other remedies otherwise awarded under the California Consumer Legal Remedies Act.

197.    California Civil Code § 1770(a)(5) states that it shall be unlawful as an unfair or deceptive act or practice to represent that any good or service has characteristics, uses, or benefits, that said good or service in fact does not have.

198.    Through its Privacy Policy, LinkedIn represented that its Services would not include blocked content that violated its User Agreement or Professional Community Policies and that the Services would connect Users with only "colleagues, partners, clients, and other professional contacts," but in fact, as evidenced by the CNBC Article, LinkedIn knew its Services did not have these characteristics, uses, or benefits of safety because LinkedIn had actual knowledge that fraudsters had infiltrated the Services and were actively targeting Users.

199.    Despite LinkedIn's knowledge that the Services lacked the safe characteristic, use, or benefit it promoted, LinkedIn continued to offer the Services without warning Plaintiffs and without blocking the content posted by the Jane Does.

200.    As a direct result of LinkedIn's misrepresentation of its Services, Plaintiffs were groomed for fraud and coerced into forfeiting approximately $7,300,000.00 to the Jane Does.

201.    Pursuant to California Civil Code § 1780(e), Plaintiffs are entitled to court costs and attorney's fees.

202.    In conformance with California Civil Code § 1782, thirty days or more prior to the commencement of this action, Plaintiffs sent a written notice by certified mail, return receipt requested, to LinkedIn at its principal place of business within California demanding that LinkedIn

rectify the damage to Plaintiffs caused by its Services, and no appropriate remedy was given to Plaintiffs within 30 days of the notice.

**FOURTH CAUSE OF ACTION**
(Breach of Contract)

203.    Plaintiffs incorporate their previous allegations as if fully rewritten herein.

204.    As more fully set forth above, a binding contract existed between Plaintiff Michael Murphy and LinkedIn that was governed by the terms of the User Agreement and the Privacy Policy (the "Contract").

205.    Plaintiff Michael Murphy fully performed his obligations under the Contract.

206.    As more fully set forth above in this Complaint, pursuant to the terms of the Contract, LinkedIn was obligated to "use automatic scanning technology on messages to support and protect [its] site," "block content that violates [its] User Agreement or Professional Community Policies from [the] Services," ensure all Users were "colleagues, partners, clients, and other professional contacts," "prevent or investigate possible fraud or other violations of [its] User Agreement and/or attempts to harm [Users]," and "regularly monitor [its] systems for possible vulnerabilities and attacks."

207.    Although the specific details of LinkedIn's technical, algorithmic, and cybersecurity failures are within the exclusive internal control of LinkedIn, upon information and belief, LinkedIn:

      a.    failed to use automatic scanning technology on messages from the Jane Does;

      b.    failed to block content posted to the Services by the Jane Does that violated the User Agreement and/or Professional Community Policies;

      c.    failed to ensure the Jane Does were Plaintiff Michael Murphy's colleagues, partners, clients, or other professional contacts;

      d.    failed to prevent or investigate possible fraud or other violations of the User Agreement by the Jane Does and/or their attempts to harm Plaintiff Michael Murphy;

      e.    failed to regularly monitor its systems for possible vulnerabilities and attacks;

      f.    failed to warn and notify Plaintiff Michael Murphy that LinkedIn removed the Jane Doe accounts; and

g.    knew during the relevant times that countless individuals were exploiting the platform for crypto fraud purposes but failed to take reasonable steps to protect and warn or sufficiently warn Users including Plaintiffs and remedy LinkedIn's technical coding and design to prevent such fraud.

208.    Therefore, LinkedIn breached the Contract with Plaintiff Michael Murphy.

209.    As a result of LinkedIn's breach of the Contract, Plaintiffs have been damaged in an amount not less than $7,300,000.00.

## FIFTH CAUSE OF ACTION

(California Business & Professions Law)

210.    Plaintiffs incorporate their previous allegations as if fully rewritten herein.

211.    LinkedIn is a corporation under Cal. Bus. & Prof. Law Subsection 17500.

212.    LinkedIn made untrue or misleading statements concerning its Services in violation of Cal. Bus. & Prof. Law Subsection 17500.

213.    LinkedIn knew it made untrue or misleading statements concerning its Services in violation of Cal. Bus. & Prof. Law Subsection 17500.

214.    LinkedIn states, "Our Services allow you to stay in touch and up to date with colleagues, partners, clients, and other professional contacts."

215.    LinkedIn also states, "***We also use automatic scanning technology on messages to support and protect our site***.  For example, we use this technology to suggest possible responses to messages and to manage or ***block content that violates our User Agreement or Professional Community Policies*** from our Services." (Emphasis added.)

216.    LinkedIn knowingly made a misdescription of absolute characteristics of its Services in the immediately preceding statements.

217.    LinkedIn had actual knowledge that fraudulent actors were using the LinkedIn Services for fraudulent activity and content to harm LinkedIn Users. Put differently, LinkedIn had actual knowledge that legitimate professionals were not the only Users of the Services.

218.    LinkedIn made a claim that Plaintiffs could connect with any colleague, partner, client, and other professional contact.

219.    LinkedIn made a claim that Plaintiffs would be protected from content that violates LinkedIn's User Agreement or Professional Community Policies from its Services. Such content would include the fraudulent actor accounts and the fraudulent activity outlined herein.

220.    LinkedIn knowingly allowed approximately 1.28 million "fake accounts" not connected to a legitimate professional to remain and exist on LinkedIn.

221.    Upon information and belief as of November 28, 2022, LinkedIn was aware that Hannah/Lee and Benedict V were using the Services to commit fraud, including leveraging the inadequate design and features of the LinkedIn platform.

222.    LinkedIn owed a duty of exercising reasonable care to Plaintiffs when making statements about its Services that would lead LinkedIn to know that such statements were misleading to the reasonable person.

223.    As a result of LinkedIn's violation of the California Business and Professions Code, Plaintiffs relied upon LinkedIn and have been damaged in an amount of not less than $2,500.00 per transgression.

### SIXTH CAUSE OF ACTION

(Common Products Liability Tort)

224.    Plaintiffs incorporate their previous allegations as if fully rewritten herein.

225.    LinkedIn negligently failed to exercise due care in supplying its Services.

226.    LinkedIn wrote algorithms to implement its requirements and standards and to help Users connect for business and professional endeavors, incentivizing Users to trust other members on LinkedIn for business and professional opportunities.

227.    LinkedIn did not remove or restrict access to fraudulent actors or fraudulent activity, particularly the Jane Does, when LinkedIn knew for months prior to the Jane Does reaching out to Plaintiffs that its Systems were not working properly to prevent such Users from joining and removing their profiles.

228.    LinkedIn had actual knowledge that fraudulent actors and fraudulent activity was purported on its Services.

229.    LinkedIn failed to warn its Users of such fraudulent actors and fraudulent activity.

230. LinkedIn created its algorithm to prefer and suppress content based on User activity and incentivized Users to connect with other individuals on LinkedIn for business and professional prosperity.

231. LinkedIn's algorithm and LinkedIn's promise of connecting Users to other legitimate business professionals enticed Users to engage and connect with fraudulent actors and fraudulent activity on LinkedIn.

232. LinkedIn should have foreseen the misuse of its Services by fraudulent actors and the consequential foreseeable damages to legitimate Users on the LinkedIn platform.

233. LinkedIn indisputably designed its Services' underlying algorithms and made that aspect of LinkedIn available to Users, and the algorithms in tandem with LinkedIn's warranties of connecting with legitimate business professionals for professional financial opportunity encouraged Users to engage with fraudulent actors and participate in fraudulent activity on LinkedIn.

WHEREFORE, Plaintiffs respectfully demand judgment against Defendant for compensatory damages in an amount to be determined by the jury, punitive damages, attorney's fees, costs, and all other relief to which they may be entitled.

Respectfully submitted,

DATED: May 8, 2025              THE BECKAGE FIRM PLLC


                               By:  */s/ Jennifer A. Beckage, Esq., CIPP/US, CIPP/E*
                               JENNIFER A. BECKAGE
                               JULIANA CIPOLLA
                               LEE MERREOT
                               Attorneys for Plaintiffs
                               MICHAEL MURPHY and
                               LAURIE MURPHY


DATED: May 8, 2025              BUCHANAN INGERSOLL & ROONEY LLP


                               By:  */s/ Jennifer M. Oliver*
                               JENNIFER M. OLIVER
                               Attorney for Plaintiffs
                               MICHAEL MURPHY and
                               LAURIE MURPHY

COMPLAINT

## JURY DEMAND

Plaintiff demands trial by a jury on all issues so triable.

COMPLAINT

EXHIBIT A





# Privacy Policy

*Effective August 11, 2020*

Our Privacy Policy has been updated.

## Your Privacy Matters

LinkedIn's mission is to connect the world's professionals to allow them to be more productive and successful. Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared.

This Privacy Policy applies when you use our Services (described below). We offer our users **choices** about the data we collect, use and share as described in this Privacy Policy, **Cookie Policy**, Settings and our **Help Center.**

Key Terms ⌄





Your organization blocked this. Contact your IT admin for more info.

Microsoft Defender SmartScreen

# Table of Contents

1. Data We Collect

2. How We Use Your Data

3. How We Share Information

4. Your Choices and Obligations

5. Other Important Information

# Introduction

 We are a social network and online platform for professionals. People use our Services to find and be found for business opportunities, to connect with others and find




knowledge and professional insights, post and view relevant content, learn and develop skills, and find business and career opportunities. Content and data on some of our Services is viewable to non-members ("Visitors").

We use the term "Designated Countries" to refer to countries in the European Union (EU), European Economic Area (EEA), and Switzerland.

# Services



This Privacy Policy, including our Cookie Policy applies to your use of our Services.

This Privacy Policy applies to LinkedIn.com, LinkedIn-branded apps, LinkedIn Learning and other LinkedIn-related sites, apps, communications and services ("Services"), including off-site Services, such as our ad services and the "Apply with LinkedIn" and "Share with LinkedIn" plugins, but excluding services that state that they are offered under a different privacy policy. For California residents, additional disclosures required by California law may be found in our California Privacy Disclosure.

# Data Controllers and Contracting Parties

If you are in the "Designated Countries", LinkedIn Ireland Unlimited Company ("LinkedIn Ireland") will be the controller of your personal data provided to, or collected by or for, or processed in connection with our Services.

If you are outside of the Designated Countries, LinkedIn Corporation will be the controller of your personal data provided to, or collected by or for, or processed in connection with, our Services.

As a Visitor or Member of our Services, the collection, use and sharing of your personal data is subject to this Privacy Policy and other documents referenced in this Privacy Policy, as well as updates.

# Change



Changes to the Privacy Policy apply to your use of our Services after the "effective date."





You acknowledge that your continued use of our Services after we publish or send a notice about our changes to this Privacy Policy means that the collection, use and sharing of your personal data is subject to the updated Privacy Policy, as of its effective date.

# 1. Data We Collect

## 1.1 Data You Provide To Us

 You provide data to create an account with us.

### Registration

To create an account you need to provide data including your name, email address and/or mobile number, and a password. If you register for a premium Service, you will need to provide payment (e.g., credit card) and billing information.

 You create your LinkedIn profile (a complete profile helps you get the most from our Services).

### Profile

You have choices about the information on your profile, such as your education, work experience, skills, photo, city or area and endorsements. You don't have to provide additional information on your profile; however, profile information helps you to get more from our Services, including helping recruiters and business opportunities find you. It's your choice whether to include sensitive information on your profile and to make that sensitive information public. Please do not post or add personal data to your profile that you would not want to be publicly available.





## Posting and Uploading

We collect personal data from you when you provide, post or upload it to our Services, such as when you fill out a form, (e.g., with demographic data or salary), respond to a survey, or submit a resume or fill out a job application on our Services. If you opt to import your address book, we receive your contacts (including contact information your service provider(s) or app automatically added to your address book when you communicated with addresses or numbers not already in your list).

If you sync your contacts or calendars with our Services, we will collect your address book and calendar meeting information to keep growing your network by suggesting connections for you and others, and by providing information about events, e.g. times, places, attendees and contacts.

You don't have to post or upload personal data; though if you don't, it may limit your ability to grow and engage with your network over our Services.

# 1.2 Data From Others



Others may post or write about you.

## Content and News

You and others may post content that includes information about you (as part of articles, posts, comments, videos) on our Services. We also may collect public information about you, such as professional-related news and accomplishments, and make it available as part of our Services, including, as permitted by your settings, in notifications to others of mentions in the news.



Others may sync their contacts or calendar with our Services

## Contact and Calendar Information





accounts with our Services, we will also collect "email header" information that we can associate with Member profiles.

 Customers and partners may provide data to us.

## Partners

We receive personal data (e.g., your job title and work email address) about you when you use the services of our customers and partners, such as employers or prospective employers and applicant tracking systems providing us job application data.

## Related Companies and Other Services

We receive data about you when you use some of the other services provided by us or our **affiliates**, including Microsoft. For example, you may choose to send us information about your contacts in Microsoft apps and services, such as Outlook, for improved professional networking activities on our Services

## 1.3 Service Use

 We log your visits and use of our Services, including mobile apps.

We log usage data when you visit or otherwise use our Services, including our sites, app and platform technology, such as when you view or click on content (e.g., learning video) or ads (on or off our sites and apps), perform a search, install or update one of our mobile apps, share articles or apply for jobs. We use log-ins, cookies, **device information** and internet protocol ("IP") addresses to identify you and log your use.

## 1.4 Cookies and Similar Technologies

 We collect data through cookies and similar technologies.

As further described in our **Cookie Policy**, we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy. If you are outside the Designated Countries, we also collect (or rely on others who collect) information

 

your behavior on the sites of others for ad targeting and other ad-related purposes. For Visitors, **the controls are here**.

## 1.5 Your Device and Location

 We receive data through cookies and similar technologies

When you visit or leave our Services (including some plugins and our cookies or similar technology on the sites of others), we receive the URL of both the site you came from and the one you go to and the time of your visit. We also get information about your network and device (e.g., IP address, proxy server, operating system, web browser and add-ons, device identifier and features, cookie IDs and/or ISP, or your mobile carrier). If you use our Services from a mobile device, that device will send us data about your location based on your phone settings. We will ask you to opt-in before we use GPS or other tools to identify your precise location.

## 1.6 Messages

 If you communicate through our Services, we learn about that.

We collect information about you when you send, receive, or engage with messages in connection with our Services. For example, if you get a LinkedIn connection request, we track whether you have acted on it and will send you reminders. We also use **automatic scanning** technology on messages to support and protect our site. For example, we use this technology to suggest possible responses to messages and to manage or block content that violates our User Agreement or **Professional Community Policies** from our Services.

## 1.7 Workplace and School Provided Information

 When your organization (e.g., employer or school) buys a premium Service for you to use, they give us data about you.

Others buying our Services for your use, such as your employer or your school, provide us with personal data about you and your eligibility to use the Services that they purchase for use by their workers, students or alumni. For example, we will get contact information for "**Company Page**" administrators and for authorizing users of our premium Services, such as our recruiting, sales or learning products.





 We get data when you visit sites that include our ads, cookies or some of our plugins or when you log-in to others' services with your LinkedIn account.

We receive information about your visits and interaction with services provided by others when you log-in with LinkedIn or visit others' services that include some of our plugins (such as "Apply with LinkedIn") or our ads, cookies or similar technologies.

## 1.9 Other

 We are improving our Services, which means we get new data and create new ways to use data.

Our Services are dynamic, and we often introduce new features, which may require the collection of new information. If we collect materially different personal data or materially change how we collect, use or share your data, we will notify you and may also modify this Privacy Policy.

Key Terms  ⌄

# 2. How We Use Your Data

 We use your data to provide, support, personalize and develop our Services.

How we use your personal data will depend on which Services you use, how you use those Services and the choices you make in your **settings**. We use the data that we have about you to provide and personalize our Services, including with the help of automated systems and inferences we make, so that our Services (including ads) can be more relevant and useful to you and others.

## 2.1 Services



opportunities, stay informed, get training and be more productive.

We use your data to authorize access to our Services and honor your settings.

## Stay Connected

Our Services allow you to stay in touch and up to date with colleagues, partners, clients, and other professional contacts. To do so, you can "connect" with the professionals who you choose, and who also wish to "connect" with you. Subject to your and their settings, when you connect with other Members, you will be able to search each others' connections in order to exchange professional opportunities.

We use data about you (such as your profile, profiles you have viewed or data provided through address book uploads or partner integrations) to help others find your profile, suggest connections for you and others (e.g. Members who share your contacts or job experiences) and enable you to invite others to become a Member and connect with you. You can also opt-in to allow us to use your precise location or proximity to others for certain tasks (e.g. to suggest other nearby Members for you to connect with, calculate the commute to a new job, or notify your connections that you are at a professional event).

It is your choice whether to invite someone to our Services, send a connection request, or allow another Member to become your connection. When you invite someone to connect with you, your invitation will include your network and basic profile information (e.g., name, profile photo, job title, region). We will send invitation reminders to the person you invited. You can choose whether or not to share your own list of connections with your connections.

Visitors have choices about how we use their data.

## Stay Informed

Our Services allow you to stay informed about news, events and ideas regarding professional topics you care about, and from professionals you respect. Our Services also allow you to improve your professional skills, or learn new ones. We use the data we have about you (e.g., data you provide, data we collect from your engagement with our Services and inferences we make from the data we have about you), to personalize our Services for you, such as by recommending or ranking relevant content and conversations on our Services. We also use the data we have about you to suggest skills you could add to your profile and skills that you might need to pursue your next opportunity. So, if you let us know that you are interested in a new skill (e.g., by watching a learning video), we will use this information to personalize content in your feed, suggest that you follow certain members on our site, or suggest related learning content to help you towards that new skill. We use your content, activity and other data, including your name and photo, to provide notices to your network and others. For example, subject to your settings, we may notify others that you have updated your profile, posted content, took a social action, used a feature, made new connections or were mentioned in the news.



Our Services allow you to explore careers, evaluate educational opportunities, and seek out, and be found for, career opportunities. Your profile can be found by those looking to hire (for a job or a specific task) or be hired by you. We will use your data to recommend jobs or mentees, show you and others relevant professional contacts (e.g., who work at a company, in an industry, function or location or have certain skills and connections). You can signal that you are interested in changing jobs and share information with recruiters. We will use your data to recommend jobs to you and you to recruiters. We may use automated systems to provide content and recommendations to help make our Services more relevant to our Members, Visitors and customers. Keeping your profile accurate and up-to-date may help you better connect to others and to opportunities through our Services.

## Productivity

Our Services allow you to collaborate with colleagues, search for potential clients, customers, partners and others to do business with. Our Services allow you to communicate with other Members and schedule and prepare meetings with them. If your settings allow, we scan messages to provide "bots" or similar tools that facilitate tasks such as scheduling meetings, drafting responses, summarizing messages or recommending next steps. Learn more.

# 2.2 Premium Services



Our premium Services help paying users to search for and contact Members through our Services, such as searching for and contacting job candidates, sales leads and co-workers, manage talent and promote content through social

We sell premium Services that provide our customers and subscribers with customized-search functionality and tools (including messaging and activity alerts) as part of our talent, marketing and sales solutions. Customers can export limited information from your profile, such as name, headline, current company, current title, and general location (e.g., Dublin), such as to manage sales leads or talent, unless you opt-out. We do not provide contact information to customers as part of these premium Services without your consent. Premium Services customers can store information they have about you in our premium Services, such as a resume or contact information or sales history. The data stored about you by these customers is subject to the policies of those customers. Other enterprise Services and features that use your data include TeamLink and Elevate (social promotion of content).

# 2.3 Communications



We contact you and enable communications between Members. We offer settings to control what messages you receive and how often you receive some types of messages.





messages about how to use our Services, network updates, reminders, job suggestions and promotional messages from us and our partners. You may change your communication **preferences** at any time. Please be aware that you cannot opt out of receiving service messages from us, including security and legal notices.

We also enable **communications** between you and others through our Services, including for example **invitations**, **InMail**, **groups** and **messages** between connections.

## 2.4 Advertising

 We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads.

We target (and measure the performance of) ads to Members, Visitors and others both on and off our Services directly or through a variety of partners, using the following data, whether separately or combined:

- Data from advertising technologies on and off our Services, pixels, ad tags, cookies, and device identifiers;

- Member-provided information (e.g., profile, contact information, title and industry);

- Data from your use of our Services (e.g., search history, feed, content you read, who you follow or is following you, connections, **groups** participation, page visits, videos you watch, clicking on an ad, etc.), including as described in Section 1.3;

- Information from advertising **partners**, vendors and **publishers** ; and

- Information inferred from data described above (e.g., using job titles from a profile to infer industry, seniority, and compensation bracket; using graduation dates to infer age or using first names or pronoun usage to infer gender; using your feed activity to infer your interests; or using device data to recognize you as a Member).

We will show you ads called **sponsored content** which look similar to non-sponsored content, except that they are labeled as advertising (e.g., as "ad" or "sponsored"). If you take a social action (such as like, comment or share) on these ads, your action is associated with your name and viewable by others, including the advertiser. Subject to your **settings**, if you take a social action on the LinkedIn Services, that action may be mentioned with related ads. For example, when you like a company we may include your name and photo when their sponsored content is shown.

## Ad Choices



to show you more relevant ads. For Visitors, **the setting is here**.

## Info to Ad Providers

We do not share your personal data with any third-party advertisers or ad networks except for: (i) hashed IDs or device identifiers (to the extent they are personal data in some countries); (ii) with your separate permission (e.g., in a lead generation form) or (iii) data already visible to any users of the Services (e.g., profile). However, if you view or click on an ad on or off our Services, the ad provider will get a signal that someone visited the page that displayed the ad, and they may, through the use of mechanisms such as cookies, determine it is you. Advertising partners can associate personal data collected by the advertiser directly from you with hashed IDs or device identifiers received from us. In such instances, we seek to contractually require such advertising partners to obtain your explicit, opt-in consent before doing so.

## 2.5 Marketing



We promote our Services to you and others.

In addition to advertising our Services, we use Members' data and content for invitations and communications promoting membership and network growth, engagement and our Services, such as by showing your connections that you have used a feature on our Services.

## 2.6 Developing Services and Research



We develop our Services and conduct research

### Service Development

We use data, including public feedback, to conduct research and development for our Services in order to provide you and others with a better, more intuitive and personalized experience, drive membership growth and engagement on our Services, and help connect professionals to each other and to economic opportunity.

### Other Research





industries and geographic areas. In some cases, we work with trusted third parties to perform this research, under controls that are designed to protect your privacy. We publish or allow others to publish economic insights, presented as aggregated data rather than personal data.

## Surveys

Polls and surveys are conducted by us and others through our Services. You are not obligated to respond to polls or surveys, and you have choices about the information you provide. You may opt-out of survey invitations.

# 2.7 Customer Support


We use data to help you and fix problems.

We use data (which can include your communications) to investigate, respond to and resolve complaints and for Service issues (e.g., bugs).

# 2.8 Insights That Do Not Identify You


We use data to generate insights that do not identify you.

We use your data to produce and share insights that do not identify you. For example, we may use your data to generate statistics about our members, their profession or industry, to calculate ad impressions served or clicked on, or to publish visitor demographics for a Service or create demographic workforce insights.

# 2.9 Security and Investigations


We use data for security, fraud prevention and investigations.

We use your data (including your communications) for security purposes or to prevent or investigate possible fraud or other violations of our User Agreement and/or attempts to harm our Members, Visitors or others.

Key Terms 





# 3.1 Our Services

  Any data that you include on your profile and any content you post or social action (e.g., likes, follows, comments, shares) you take on our Services will be seen by others, consistent with your settings.

## Profile

Your profile is fully visible to all Members and customers of our Services. Subject to your settings, it can also be visible to others on or off of our Services (e.g., Visitors to our Services or users of third- party search engines). As detailed in our Help Center, your settings, degree of connection with the viewing Member, the subscriptions they may have, their usage of our Services, access channels and search types (e.g., by name or by keyword) impact the availability of your profile and whether they can view certain fields in your profile.

## Posts, Likes, Follows, Comments, Messages

Our Services allow viewing and sharing information including through posts, likes, follows and comments.

- When you share an article or a post (e.g., an update, image, video or article) publicly it can be viewed by everyone and re-shared anywhere (subject to your settings). Members, Visitors and others will be able to find and see your publicly-shared content, including your name (and photo if you have provided one).

- In a group, posts are visible to others in the group. Your membership in groups is public and part of your profile, but you can change visibility in your settings.

- Any information you share through companies' or other organizations' pages on our Services will be viewable by it and others who visit those pages.

- When you follow a person or organization, you are visible to others and that "page owner" as a follower.

- We let senders know when you act on their message, subject to your settings where applicable.

- Subject to your settings, we let a Member know when you view their profile.





 Your employer can see how you use Services they provided for your work (e.g. as a recruiter or sales agent) and related information. We will not show them your job searches or personal messages.

## Enterprise Accounts

Your employer may offer you access to our enterprise Services such as Recruiter, Sales Navigator, LinkedIn Learning or our advertising Campaign Manager. Your employer can review and manage your use of such enterprise Services.

Depending on the enterprise Service, before you use such Service, we will ask for permission to share with your employer relevant data from your profile or use of our non-enterprise Services. For example, users of Sales Navigator will be asked to share their "social selling index", a score calculated in part based on their personal account activity. We understand that certain activities such as job hunting and personal messages are sensitive, and so we do not share those with your employer unless you choose to share it with them through our Services (for example, by applying for a new position in the same company or mentioning your job hunting in a message to a co-worker through our Services).

Subject to your **settings**, when you use workplace tools and services (e.g., interactive employee directory tools) certain of your data may also be made available to your employer or be connected with information we receive from your employer to enable these tools and services.

## 3.2 Communication Archival

 Regulated Members may need to store communications outside of our Service.

Some Members (or their employers) need, for legal or professional compliance, to archive their communications and social media activity, and will use services of others to provide these archival services. We enable archiving of messages by and to those Members outside of our Services. For example, a financial advisor needs to archive communications with her clients through our Services in order to maintain her professional financial advisor license.

## 3.3 Others' Services





profiles, post your shares on such platforms, or enable you to start conversations with your connections on such platforms. Excerpts from your profile will also appear on the services of others.

Subject to your settings, other services may look up your profile. When you opt to link your account with other services, personal data will become available to them. The sharing and use of that personal data will be described in, or linked to, a consent screen when you opt to link the accounts. For example, you may link your Twitter or WeChat account to share content from our Services into these other services, or your email provider may give you the option to upload your LinkedIn contacts into its own service. Third-party services have their own privacy policies, and you may be giving them permission to use your data in ways we would not. You may revoke the link with such accounts.

Subject to your settings, excerpts from your profile will appear on the services of others (e.g., search engine results, mail and calendar applications that show a user limited profile data of the person they are meeting or messaging, social media aggregators, talent and lead managers). "Old" profile information remains on these services until they update their data cache with changes you made to your profile.

## 3.4 Related Services

 We share your data across our different Services and LinkedIn affiliated entities.

We will share your personal data with our affiliates to provide and develop our Services. We may combine information internally across the different Services covered by this Privacy Policy to help our Services be more relevant and useful to you and others. For example, we may personalize your feed or job recommendations based on your learning history.

## 3.5 Service Providers

 We may use others to help us with our Services.

We use others to help us provide our Services (e.g., maintenance, analysis, audit, payments, fraud detection, marketing and development). They will have access to your information as reasonably necessary to perform these tasks on our behalf and are obligated not to disclose or use it for other purposes.

## 3.6 Legal Disclosures



the rights and safety of you, us or others.

It is possible that we will need to disclose information about you when required by law, subpoena, or other legal process or if we have a good faith belief that disclosure is reasonably necessary to (1) investigate, prevent or take action regarding suspected or actual illegal activities or to assist government enforcement agencies; (2) enforce our agreements with you; (3) investigate and defend ourselves against any third-party claims or allegations; (4) protect the security or integrity of our Services (such as by sharing with companies facing similar threats); or (5) exercise or protect the rights and safety of LinkedIn, our Members, personnel or others. We attempt to notify Members about legal demands for their personal data when appropriate in our judgment, unless prohibited by law or court order or when the request is an emergency. We may dispute such demands when we believe, in our discretion, that the requests are overbroad, vague or lack proper authority, but we do not promise to challenge every demand. To learn more see our **Data Request Guidelines** and **Transparency Report**.

## 3.7 Change in Control or Sale



We may share your data when our business is sold to others, but it must continue to be used in accordance with this Privacy Policy.

We can also share your personal data as part of a sale, merger or change in control, or in preparation for any of these events. Any other entity which buys us or part of our business will have the right to continue to use your data, but only in the manner set out in this Privacy Policy unless you agree otherwise.

# 4. Your Choices & Obligations

## 4.1 Data Retention



We keep most of your personal data for as long as your account is open.

We generally retain your personal data as long as you keep your account open or as needed to provide you Services. This includes data you or others provided to us and data generated or inferred from your use of our Services. Even if you only use our Services when looking for a new job every few years, we will retain your information and keep your profile open, unless you close your account. In some cases we choose to retain certain information (e.g., insights about Services use) in a depersonalized or aggregated form.





 You can access or delete your personal data. You have many choices about how your data is collected, used and shared.

We provide many choices about the collection, use and sharing of your data, from deleting or correcting data you include in your profile and controlling the visibility of your posts to advertising opt-outs and communication controls. We offer you settings to control and manage the personal data we have about you.

For personal data that we have about you, you can:

- Delete Data: You can ask us to erase or delete all or some of your personal data (e.g., if it is no longer necessary to provide Services to you).

- Change or Correct Data: You can edit some of your personal data through your account. You can also ask us to change, update or fix your data in certain cases, particularly if it's inaccurate.

- Object to, or Limit or Restrict, Use of Data: You can ask us to stop using all or some of your personal data (e.g., if we have no legal right to keep using it) or to limit our use of it (e.g., if your personal data is inaccurate or unlawfully held).

- Right to Access and/or Take Your Data: You can ask us for a copy of your personal data and can ask for a copy of personal data you provided in machine readable form.

Visitors can learn more about how to make these requests here. You may also contact us using the contact information below, and we will consider your request in accordance with applicable laws.

Residents in the Designated Countries and other regions may have additional rights under their laws.

## 4.3 Account Closure

 We keep some of your data even after you close your account.

If you choose to close your Linkedin account, your personal data will generally stop being visible to others on our Services within 24 hours. We generally delete closed account information within 30 days of account closure, except as noted below.



Community Policies), enforce our User Agreement, or fulfill your request to "unsubscribe" from further messages from us. We will retain de-personalized information after your account has been closed.

Information you have shared with others (e.g., through InMail, updates or group posts) will remain visible after you close your account or delete the information from your own profile or mailbox, and we do not control data that other Members have copied out of our Services. Groups content and ratings or review content associated with closed accounts will show an unknown user as the source. Your profile may continue to be displayed in the services of others (e.g., search engine results) until they refresh their cache.

# 5. Other Important Information

## 5.1. Security

 We monitor for and try to prevent security breaches. Please use the security features available through our Services.

We implement security safeguards designed to protect your data, such as HTTPS. We regularly monitor our systems for possible vulnerabilities and attacks. However, we cannot warrant the security of any information that you send us. There is no guarantee that data may not be accessed, disclosed, altered, or destroyed by breach of any of our physical, technical, or managerial safeguards. Please visit our Safety Center for additional information about safely using our Services, including two-factor authentication.

## 5.2. Cross-Border Data Transfers

 We store and use your data outside your country.

We process data both inside and outside of the United States and rely on legally-provided mechanisms to lawfully transfer data across borders. Learn more. Countries where we process data may have laws which are different from, and potentially not as protective as, the laws of your own country.

## 5.3 Lawful Bases for Processing





to settings.

We will only collect and process personal data about you where we have lawful bases. Lawful bases include consent(where you have given consent), contract (where processing is necessary for the performance of a contract with you (e.g., to deliver the LinkedIn Services you have requested) and "legitimate interests." Learn more.

Where we rely on your consent to process personal data, you have the right to withdraw or decline your consent at any time and where we rely on legitimate interests, you have the right to object. Learn More. If you have any questions about the lawful bases upon which we collect and use your personal data, please contact our Data Protection Officer here.

## 5.4. Direct Marketing and Do Not Track Signals

 Our statements regarding direct marketing and "do not track" signals.

We currently do not share personal data with third parties for their direct marketing purposes without your permission. Learn more about this and about our response to "do not track" signals.

## 5.5. Contact Information

 You can contact us or use other options to resolve any complaints.

If you have questions or complaints regarding this Policy, please first contact LinkedIn online. You can also reach us by physical mail. If contacting us does not resolve your complaint, you have more options. Residents in the Designated Countries and other regions may also have the right to contact our Data Protection Officer here. If this does not resolve your complaint, Residents in the Designated Countries and other regions may have more options under their laws.

Key Terms ⌄

© 2023

Accessibility

Privacy Policy

About

User Agreement

Cookie Policy





Language

EXHIBIT B





# User Agreement

*Effective on February 1, 2022*

Our mission is to connect the world's professionals to allow them to be more productive and successful. Our services are designed to promote economic opportunity for our members by enabling you and millions of other professionals to meet, exchange ideas, learn, and find opportunities or employees, work, and make decisions in a network of trusted relationships.

Your organization blocked this. Contact your IT admin for more info.

Microsoft Defender SmartScreen

# Table of Contents:





2. Obligations

3. Rights and Limits

4. Disclaimer and Limit of Liability

5. Termination

6. Governing Law and Dispute Resolution

7. General Terms

8. LinkedIn "Dos and Don'ts"

9. Complaints Regarding Content

10. How To Contact Us

# Introduction

## 1.1 Contract

 When you use our Services you agree to all of these terms. Your use of our Services is also subject to our Cookie Policy and our Privacy Policy, which covers how we collect, use, share, and store your personal information.

You agree that by clicking "Join Now", "Join LinkedIn", "Sign Up" or similar, registering, accessing or using our services (described below), you are agreeing to enter into a legally binding contract with LinkedIn (even if you are using our Services on behalf of a company). If you do not agree to this contract ("Contract" or "User Agreement"), do not click "Join Now" (or similar) and do not access or otherwise use any of our Services. If you wish to terminate this contract, at any time you can do so by closing your account and no longer accessing or using our Services.

## Services

 

LinkedIn" plugins. Registered users of our Services are "Members" and unregistered users are "Visitors".

## LinkedIn

You are entering into this Contract with LinkedIn (also referred to as "we" and "us").

We use the term "Designated Countries" to refer to countries in the European Union (EU), European Economic Area (EEA), and Switzerland.

If you reside in the "Designated Countries", you are entering into this Contract with LinkedIn Ireland Unlimited Company ("LinkedIn Ireland") and LinkedIn Ireland will be the controller of your personal data provided to, or collected by or for, or processed in connection with our Services.

If you reside outside of the "Designated Countries", you are entering into this Contract with LinkedIn Corporation ("LinkedIn Corp.") and LinkedIn Corp. will be the controller of your personal data provided to, or collected by or for, or processed in connection with our Services.

 This Contract applies to Members and Visitors.

As a Visitor or Member of our Services, the collection, use and sharing of your personal data is subject to this Privacy Policy (which includes our Cookie Policy and other documents referenced in this Privacy Policy) and updates.

## 1.2 Members and Visitors

When you register and join the LinkedIn Services, you become a Member. If you have chosen not to register for our Services, you may access certain features as a "Visitor."

## 1.3 Change

 We may make changes to the Contract.

We may modify this Contract, our Privacy Policy and our Cookies Policy from time to time. If we make material changes to it, we will provide you notice through our Services, or by other means, to provide you the opportunity to review the changes before they become effective. We agree that changes cannot be retroactive. If you object to





# 2. Obligations

## 2.1 Service Eligibility

 Here are some promises that you make to us in this Contract:

 You're eligible to enter into this Contract and you are at least our "Minimum Age."

The Services are not for use by anyone under the age of 16.

To use the Services, you agree that: (1) you must be the **"Minimum Age"**(described below) or older; (2) you will only have one LinkedIn account, which must be in your real name; and (3) you are not already restricted by LinkedIn from using the Services. Creating an account with false information is a violation of our terms, including accounts registered on behalf of others or persons under the age of 16.

"Minimum Age" means 16 years old. However, if law requires that you must be older in order for LinkedIn to lawfully provide the Services to you without parental consent (including using of your personal data) then the Minimum Age is such older age.

## 2.2 Your Account

 You will keep your password a secret

 You will not share an account with anyone else and will follow our rules and the law.

Members are account holders. You agree to: (1) use a strong password and keep it confidential; (2) not transfer any part of your account (e.g., connections) and (3) follow the law and our list of Dos and Don'ts and **Professional Community Policies**. You are responsible for anything that happens through your account unless you close it or report misuse.



have rights to your personal account

## 2.3 Payment



You'll honor your payment obligations and you are okay with us storing your payment information. You understand that there may be fees and taxes that are added to our prices.



Refunds are subject to our policy.

If you buy any of our paid Services ("Premium Services"), you agree to pay us the applicable fees and taxes and to **additional terms** specific to the paid Services. Failure to pay these fees will result in the termination of your paid Services. Also, you agree that:

- Your purchase may be subject to foreign exchange fees or differences in prices based on location (e.g. exchange rates).

- We may store and continue billing your payment method (e.g. credit card) even after it has expired, to avoid interruptions in your Services and to use to pay other Services you may buy.

- If you purchase a subscription, your payment method automatically will be charged at the start of each subscription period for the fees and taxes applicable to that period. To avoid future charges, cancel before the renewal date. Learn how to **cancel or suspend** your Premium Services.

- All of your purchases of Services are subject to LinkedIn's **refund policy**.

- We may calculate taxes payable by you based on the billing information that you provide us at the time of purchase.

You can get a copy of your invoice through your LinkedIn account settings under "**Purchase History**".

## 2.4 Notices and Messages



You're okay with us providing notices and messages to you through our websites, apps, and contact information. If your contact information is out of date, you may miss out on

 

to the contact information you provided us (e.g., email, mobile number, physical address). You agree to keep your contact information up to date.

Please review your settings to control and limit messages you receive from us.

## 2.5 Sharing

 When you share information on our Services, others can see, copy and use that information.

Our Services allow messaging and sharing of information in many ways, such as your profile, articles, group posts, links to news articles, job postings, messages and InMails. Information and content that you share or post may be seen by other Members, Visitors or others (including off of the Services). Where we have made settings available, we will honor the choices you make about who can see content or information (e.g., message content to your addressees, sharing content only to LinkedIn connections, restricting your profile visibility from search engines, or opting not to notify others of your LinkedIn profile update). For job searching activities, we default to not notifying your connections network or the public. So, if you apply for a job through our Service or opt to signal that you are interested in a job, our default is to share it only with the job poster.

We are not obligated to publish any information or content on our Service and can remove it with or without notice.

 Key terms ⌄

# 3. Rights and Limits

## 3.1. Your License to LinkedIn

 You own all of the content, feedback and personal information you provide to us, but you also grant us a non-exclusive license to it.





As between you and LinkedIn, you own the content and information that you submit or post to the Services, and you are only granting LinkedIn and our affiliates the following non-exclusive license:

A worldwide, transferable and sublicensable right to use, copy, modify, distribute, publish and process, information and content that you provide through our Services and the services of others, without any further consent, notice and/or compensation to you or others. These rights are limited in the following ways:

1. You can end this license for specific content by deleting such content from the Services, or generally by closing your account, except (a) to the extent you shared it with others as part of the Service and they copied, re-shared it or stored it and (b) for the reasonable time it takes to remove from backup and other systems.

2. We will not include your content in advertisements for the products and services of third parties to others without your separate consent (including sponsored content). However, we have the right, without payment to you or others, to serve ads near your content and information, and your social actions may be visible and included with ads, as noted in the Privacy Policy. If you use a Service feature, we may mention that with your name or photo to promote that feature within our Services, subject to your settings.

3. We will get your consent if we want to give others the right to publish your content beyond the Services. However, if you choose to share your post as "public, everyone or similar", we will enable a feature that allows other Members to embed that public post onto third-party services, and we enable search engines to make that public content findable though their services. Learn More

4. While we may edit and make format changes to your content (such as translating or transcribing it, modifying the size, layout or file type or removing metadata), we will not modify the meaning of your expression.

5. Because you own your content and information and we only have non-exclusive rights to it, you may choose to make it available to others, including under the terms of a Creative Commons license.

 You and LinkedIn agree that if content includes personal data, it is subject to our Privacy Policy.

You and LinkedIn agree that we may access, store, process and use any information and personal data that you provide in accordance with, the terms of the Privacy Policy and your choices (including settings).

By submitting suggestions or other feedback regarding our Services to LinkedIn, you agree that LinkedIn can use and share (but does not have to) such feedback for any purpose without compensation to you.



and that your LinkedIn profile will be truthful.

You agree to only provide content or information that does not violate the law nor anyone's rights (including intellectual property rights). You also agree that your profile information will be truthful. LinkedIn may be required by law to remove certain information or content in certain countries.

## 3.2 Service Availability

 We may change or end any Service or modify our prices prospectively.

We may change, suspend or discontinue any of our Services. We may also modify our prices effective prospectively upon reasonable notice to the extent allowed under the law.

We don't promise to store or keep showing any information and content that you've posted. LinkedIn is not a storage service. You agree that we have no obligation to store, maintain or provide you a copy of any content or information that you or others provide, except to the extent required by applicable law and as noted in our Privacy Policy.

## 3.3 Other Content, Sites and Apps

 Your use of others' content and information posted on our Services, is at your own risk.

 Others may offer their own products and services through our Services, and we aren't responsible for those third-party activities.

By using the Services, you may encounter content or information that might be inaccurate, incomplete, delayed, misleading, illegal, offensive or otherwise harmful. LinkedIn generally does not review content provided by our Members or others. You agree that we are not responsible for others' (including other Members') content or information. We cannot always prevent this misuse of our Services, and you agree that we are not responsible for any such misuse. You also acknowledge the risk that you or your organization may be mistakenly associated with content about others when we let connections and followers know you or your organization were mentioned in the news. Members have **choices** about this **feature**.

LinkedIn may help connect Members offering their services (career coaching, accounting, etc.) with Members seeking services. LinkedIn does not perform nor employs individuals to perform these services. You must be at least 18 years of age to offer, perform or procure these services. You acknowledge that LinkedIn does not



relationship between LinkedIn and any Member offering services. If you are a Member offering services, you represent and warrant that you have all the required licenses and will provide services consistent with our **Professional Community Policies**.

Similarly, LinkedIn may help you register for and/or attend events organized by Members and connect with other Members who are attendees at such events. You agree that (1) LinkedIn is not responsible for the conduct of any of the Members or other attendees at such events, (2) LinkedIn does not endorse any particular event listed on our Services, (3) LinkedIn does not review and/or vet any of these events, and (4) that you will adhere to these terms and conditions that apply to such events.

## 3.4 Limits

 We have the right to limit how you connect and interact on our Services.

LinkedIn reserves the right to limit your use of the Services, including the number of your connections and your ability to contact other Members. LinkedIn reserves the right to restrict, suspend, or terminate your account if you breach this Contract or the law or are misusing the Services (e.g., violating any of the Dos and Don'ts or **Professional Community Policies**).

## 3.5 Intellectual Property Rights

 We're providing you notice about our intellectual property rights.

LinkedIn reserves all of its intellectual property rights in the Services. Trademarks and logos used in connection with the Services are the trademarks of their respective owners. LinkedIn, and "in" logos and other LinkedIn trademarks, service marks, graphics and logos used for our Services are trademarks or registered trademarks of LinkedIn.

## 3.6 Automated Processing

 We use data and information about you to make relevant suggestions to you and others.

We use the information and data that you provide and that we have about Members to make recommendations for connections, content and features that may be useful to you. For example, we use data and information about



# 4. Disclaimer and Limit of Liability

## 4.1 No Warranty

 This is our disclaimer of legal liability for the quality, safety, or reliability of our Services.

LINKEDIN AND ITS AFFILIATES MAKE NO REPRESENTATION OR WARRANTY ABOUT THE SERVICES, INCLUDING ANY REPRESENTATION THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, AND PROVIDE THE SERVICES (INCLUDING CONTENT AND INFORMATION) ON AN "AS IS" AND "AS AVAILABLE" BASIS. TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, LINKEDIN AND ITS AFFILIATES DISCLAIM ANY IMPLIED OR STATUTORY WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF TITLE, ACCURACY OF DATA, NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## 4.2 Exclusion of Liability

 These are the limits of legal liability we may have to you.

TO THE FULLEST EXTENT PERMITTED BY LAW (AND UNLESS LINKEDIN HAS ENTERED INTO A SEPARATE WRITTEN AGREEMENT THAT OVERRIDES THIS CONTRACT), LINKEDIN, INCLUDING ITS AFFILIATES, WILL NOT BE LIABLE IN CONNECTION WITH THIS CONTRACT FOR LOST PROFITS OR LOST BUSINESS OPPORTUNITIES, REPUTATION (E.G., OFFENSIVE OR DEFAMATORY STATEMENTS), LOSS OF DATA (E.G., DOWN TIME OR LOSS, USE OF, OR CHANGES TO, YOUR INFORMATION OR CONTENT) OR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES.

LINKEDIN AND ITS AFFILIATES WILL NOT BE LIABLE TO YOU IN CONNECTION WITH THIS CONTRACT FOR ANY AMOUNT THAT EXCEEDS (A) THE TOTAL FEES PAID OR PAYABLE BY YOU TO LINKEDIN FOR THE SERVICES DURING THE TERM OF THIS CONTRACT, IF ANY, OR (B) US $1000.

## 4.3 Basis of the Bargain; Exclusions





These limitations of liability do not apply to liability for death or personal injury or for fraud, gross negligence or intentional misconduct, or in cases of negligence where a material obligation has been breached, a material obligation being such which forms a prerequisite to our delivery of services and on which you may reasonably rely, but only to the extent that the damages were directly caused by the breach and were foreseeable upon conclusion of this Contract and to the extent that they are typical in the context of this Contract.

## 5. Termination

 We can each end this Contract, but some rights and obligations survive.

Both you and LinkedIn may terminate this Contract at any time with notice to the other. On termination, you lose the right to access or use the Services. The following shall survive termination:

- Our rights to use and disclose your feedback;

- Members and/or Visitors' rights to further re-share content and information you shared through the Services;

- Sections 4, 6, 7, and 8.2 of this Contract;

- Any amounts owed by either party prior to termination remain owed after termination.

You can visit our **Help Center** to close your account.

## 6. Governing Law and Dispute Resolution

 In the unlikely event we end up in a legal dispute, depending on where you live, you and LinkedIn agree to resolve it in California courts using California law, Dublin, Ireland courts using Irish law, or in your local courts using local law.



agree to choose the courts of the country to which we direct your Services where you have habitual residence for all disputes arising out of or relating to this User Agreement, or in the alternative, you may choose the responsible court in Ireland.

For others outside of Designated Countries, including those who live outside of the United States: You and LinkedIn agree that the laws of the State of California, U.S.A., excluding its conflict of laws rules, shall exclusively govern any dispute relating to this Contract and/or the Services. You and LinkedIn both agree that all claims and disputes can be litigated only in the federal or state courts in Santa Clara County, California, USA, and you and LinkedIn each agree to personal jurisdiction in those courts

---

# 7. General Terms

 Here are some important details about the Contract.

If a court with authority over this Contract finds any part of it unenforceable, you and we agree that the court should modify the terms to make that part enforceable while still achieving its intent. If the court cannot do that, you and we agree to ask the court to remove that unenforceable part and still enforce the rest of this Contract.

This Contract (including additional terms that may be provided by us when you engage with a feature of the Services) is the only agreement between us regarding the Services and supersedes all prior agreements for the Services.

If we don't act to enforce a breach of this Contract, that does not mean that LinkedIn has waived its right to enforce this Contract. You may not assign or transfer this Contract (or your membership or use of Services) to anyone without our consent. However, you agree that LinkedIn may assign this Contract to its affiliates or a party that buys it without your consent. There are no third-party beneficiaries to this Contract.

You agree that the only way to provide us legal notice is at the addresses provided in Section 10.

---

# 8. LinkedIn "Dos and Don'ts"







## 8.1. Dos

**You agree that you will:**

1. Comply with all applicable laws, including, without limitation, privacy laws, intellectual property laws, anti-spam laws, export control laws, tax laws, and regulatory requirements;

2. Provide accurate information to us and keep it updated;

3. Use your real name on your profile; and

4. Use the Services in a professional manner.

## 8.2. Don'ts

**You agree that you will *not*:**

1. Create a false identity on LinkedIn, misrepresent your identity, create a Member profile for anyone other than yourself (a real person), or use or attempt to use another's account;

2. Develop, support or use software, devices, scripts, robots or any other means or processes (including crawlers, browser plugins and add-ons or any other technology) to scrape the Services or otherwise copy profiles and other data from the Services;

3. Override any security feature or bypass or circumvent any access controls or use limits of the Service (such as caps on keyword searches or profile views);

4. Copy, use, disclose or distribute any information obtained from the Services, whether directly or through third parties (such as search engines), without the consent of LinkedIn;

5. Disclose information that you do not have the consent to disclose (such as confidential information of others (including your employer));

6. Violate the intellectual property rights of others, including copyrights, patents, trademarks, trade secrets or other proprietary rights. For example, do not copy or distribute (except through the available sharing functionality) the posts or other content of others without their permission, which they may give by posting under a Creative Commons license;



name, email, or URL except as provided in the Brand Guidelines;

8. Post anything that contains software viruses, worms, or any other harmful code;

9. Reverse engineer, decompile, disassemble, decipher or otherwise attempt to derive the source code for the Services or any related technology that is not open source;

10. Imply or state that you are affiliated with or endorsed by LinkedIn without our express consent (e.g., representing yourself as an accredited LinkedIn trainer);

11. Rent, lease, loan, trade, sell/re-sell or otherwise monetize the Services or related data or access to the same, without LinkedIn's consent;

12. Deep-link to our Services for any purpose other than to promote your profile or a Group on our Services, without LinkedIn's consent;

13. Use bots or other automated methods to access the Services, add or download contacts, send or redirect messages;

14. Monitor the Services' availability, performance or functionality for any competitive purpose;

15. Engage in "framing," "mirroring," or otherwise simulating the appearance or function of the Services;

16. Overlay or otherwise modify the Services or their appearance (such as by inserting elements into the Services or removing, covering, or obscuring an advertisement included on the Services);

17. Interfere with the operation of, or place an unreasonable load on, the Services (e.g., spam, denial of service attack, viruses, gaming algorithms); and/or

18. Violate the Professional Community Policies or any additional terms concerning a specific Service that are provided when you sign up for or start using such Service, and the Bing Maps terms where applicable.

# 9. Complaints Regarding Content



Contact information for complaint about content provided by our Members.





# 10. How To Contact Us

 Our Contact information. Our Help Center also provides information about our Services.

For general inquiries, you may contact us online. For legal notices or service of process, you may write us at these addresses.

© 2023

Accessibility

Privacy Policy

Copyright Policy

Guest Controls

Language

About

User Agreement

Cookie Policy

Brand Policy

Community Guidelines